## BEAVER CO. v. UNITED STATES (No. 1999).[1]

WOOD PULP—PULPBOARD.

Mechanically ground wood pulp, in sheet form, imported in rolls, the sheet being of a width and thickness especially suitable for the manufacture of a particular kind of pulpboard does not, by reason of its form, become "pulpboard" within the meaning of that term in paragraph 320, tariff act of 1913, but remains "mechanically ground wood pulp" within the meaning of that expression in paragraph 649.

### United States Court of Customs Appeals, February 2, 1920.

APPEAL from Board of United States General Appraisers, G. A. 8280 (T. D. 38093)

[Reversed.]

*Gerry & Wakefield* for appellants.

*Bert Hanson,* Assistant Attorney General (*Martin T. Baldwin,* special attorney, of counsel), for the United States.

[Oral argument Dec. 18, 1919, by Mr. Wakefield and Mr. Baldwin.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Certain merchandise imported at the port of Buffalo, N. Y., by the Beaver Co., and classified by the collector of customs as pulp board not laminated, was assessed for duty at 5 per cent ad valorem under that part of paragraph 320 of the tariff act of 1913, which paragraph in so far as pertinent to the case reads as follows:

320. * * * pulpboard in rolls, not laminated, * * * common paper-box board, 5 per centum ad valorem.

The importer protested that the merchandise was free of duty either as crude paper stock under paragraph 566, or as wood pulp under paragraph 649 of said act. That part of paragraph 566 of the free list under which importer claimed free entry, reads as follows:

566. Paper stock, crude, of every description, * * * used chiefly for paper making.

Paragraph 649 of the free list is as follows:

649. Mechanically ground wood pulp, chemical wood pulp, unbleached or bleached, and rag pulp.

The board of general appraisers overruled the protest and the importer appealed.

The testimony shows that to produce merchandise, such as that imported, spruce, balsam, aspen or poplar logs or other woods, are forced against a grinder by hydraulic pressure and are thereby shredded into small particles of fiber. The ground product diluted with water is screened in order to remove slivers, chips and other undisintegrated material and is then passed to a cylinder covered

---

[1] T. D. 38258 (38 Treas. Dec., 73).

with fine wire, which by centrifugal force extracts 97 per cent of the water. Additional moisture is removed from the screened mass of fiber either by sending it through a drying machine or by submitting it to hydraulic pressure. Finally, the material so dried is put up in rolls ready for shipment and in that condition constitutes the commodity imported.

All of the witnesses for the importer agree that to convert the material imported into pulpboard of any kind it must be sized, and the testimony is positive that laminated pulpboard is produced by treating two or more sheets with chemicals and pressing the sheets into one by running them through a machine called a laminator. According to these witnesses the merchandise in issue was neither sized nor laminated and was nothing more than dried wood pulp. William T. Bannister, a witness for the Government, admitted that pulpboard must have enough sizing in it to hold it together, and that, as a rule, to the best of his knowledge, "some sizing was always put in." In his opinion, however, all of the samples of the importation in evidence, and particularly Exhibit 5, had some sizing.

Samples of the merchandise were submitted, by the Assistant Attorney General, to the Government chemist for analysis and a report as to whether they contained clay, sulphite, or sizing, or anything other than mechanically ground wood pulp. The chemist reported that the samples were *mechanical wood pulp*, and that samples 3, 4, 6, and 7 did not contain rosin size, starch, dextrin, or mineral sizing. He found that sample 5 did not contain rosin size, starch, or dextrin, but had 0.32 per cent of silicate of alumina—that is to say, clay.

We think it fair to infer from the evidence that the merchandise in question is a wood pulp advanced to the extent and in the sense that it is made in the sizes and of the thicknesses specially required by pulp-board manufacturers. Advanced though it be, however, the commodity has not been sufficiently processed to carry it into the category of "pulp board," and the clear weight of the evidence justifies us in concluding that whatever its size or thickness, it is ground wood reduced to a pulp and then screened and dried. Such an article is a dry wood pulp, and a dry wood pulp which, as the evidence establishes, differs from other dry wood pulp in the one particular that it has been given dimensions peculiarly suitable for the manufacture of a particular kind of pulp board.

Of course, if prior to the act of 1913 the trade had given the name of pulp board to certain forms, sizes, or thicknesses of dried-wood pulp, that commercial designation would determine classification of the merchandise regardless of its composition and of the fact that its components were identical with those of other dry wood pulps of a form, size, or thickness which excluded them from the term pulp board as understood in the trade.

We do not think, however, that any such trade understanding has been established by the evidence. The best that can be said of the testimony as to commercial designation is that it is conflicting, and that the witnesses who testified that merchandise like that imported was bought and sold in the trade as pulp board did not know the components of the merchandise sold by them, or if they knew that, the chemical analysis establishes that they did not know and probably could not know the components of the goods which were the subject of protest.

The decision of the Board of General Appraisers is *reversed*.